85 N.Y.2d 382 (1995)
649 N.E.2d 1145
626 N.Y.S.2d 1
In the Matter of Chemical Specialties Manufacturers Association et al., Appellants,
v.
Thomas C. Jorling, as Commissioner of the New York State Department of Environmental Conservation, et al., Respondents.
Court of Appeals of the State of New York.
Argued October 25, 1994
Decided February 9, 1995.
McKenna & Cuneo (Charles A. O'Connor, III, and Thomas B. Johnson, of the District of Columbia Bar, admitted pro hac vice, of counsel), and Hinman Straub, Pigors & Manning, P. C., Albany (Eileen M. Considine and Beverly Cohen of counsel), for appellants.
G. Oliver Koppell, Attorney-General, Albany (Maureen F. Leary, Jerry Boone, Peter F. Schiff and Val Washington of counsel), for respondents.
Chief Judge KAYE and Judges SIMONS, TITONE and SMITH concur with Judge LEVINE; Judge CIPARICK dissents in a separate opinion in which Judge BELLACOSA concurs.
*386 LEVINE, J.
In response to a report by the New York Department of Health recommending that the Department of Environmental *387 Conservation (DEC) promulgate a regulation limiting the concentration of a pesticide called DEET (N, N-diethyl-m-toluamide) in products sold in New York, DEC notified DEET product registrants of a proposed rule that would amend the existing list of restricted use pesticides contained in 6 NYCRR 326.2 (b). The proposed rule would have added DEET in concentrations greater than 30% to the list. At that time, DEC issued a SEQRA notice in the form of a Determination of Non-Significance regarding the proposed rule making. DEC then published a Notice of Proposed Rule Making which contained a regulatory impact statement, and the rationale for the proposed rule. DEC notified parties holding registrations for high concentration DEET products about the proposed rule and of a legislative public hearing that would be held to accept public comment on the proposed rule. The hearing was held on July 23, 1991, and numerous oral and written comments were submitted, including submissions by petitioners Chemical Specialties Manufactures Association. After the hearing, DEC solicited information from all high concentration DEET registrants regarding any potential impact the proposed rule would have on their businesses. DEC also accepted comments from other agencies, other manufacturers, and the public during the public comment period.
After publishing reports summarizing the legislative hearing and public comments, responding to the public comments, and issuing a revised negative SEQRA declaration, DEC issued a Notice of Adoption of the proposed rule. The DEET regulation, as adopted, prohibits use, sale or distribution of pesticide products which contain in excess of 30% DEET, or 33% DEET for controlled release formulas (6 NYCRR 326.2 [b] [10]). Products containing 30% or less DEET concentration (or less than 33.33% in controlled release formulas) continue to be classified for general use (id.; see also, ECL 33-0101 [19]). After publishing the rule, DEC advised registrants of high concentration DEET products that their products would no longer comply with the DEET regulation and that the product registrations would be canceled as of the effective date of the regulation.
Upon receipt of the notice of cancellation, the affected registrants requested that DEC refer the cancellation decision to an independent advisory committee, as is required under title 7 of ECL article 33. DEC denied the request.
*388 Petitioners, a trade organization of chemical manufacturers, DEET product registrants, and a user of high concentration DEET products, commenced this action seeking declaratory and injunctive relief. Petitioners challenge the validity of the DEET regulation on the grounds that (1) respondents lacked statutory authorization to ban pesticide products by rule making; (2) respondents lacked statutory authority to effect cancellation of pesticide registrations by the DEET rule; (3) adoption of the DEET rule was arbitrary and capricious; (4) adoption of the DEET rule violated the State Environmental Quality Review Act (ECL art 8) (SEQRA); and (5) the DEET rule violates the Commerce Clause of the United States Constitution.
Supreme Court invalidated the rule on the ground that respondents exceeded their rule-making authority. The Appellate Division modified, holding that the rule was valid but that the rule does not and cannot automatically cancel the existing pesticide registrations (197 AD2d 314). The Appellate Division further held, however, that in any such proceeding to cancel the registration of high DEET concentration pesticide products, "[t]he registrant cannot challenge the validity of the DEET regulation" (id., at 320).
Petitioners appealed as of right to this Court on constitutional grounds. We now affirm the order of the Appellate Division.

I.
ECL article 33 contains separate and independent mechanisms by which pesticide use, sale, and distribution are regulated throughout the State. At issue in this case are title 3, containing the general rule-making power of the Commissioner, and title 7, the individual adjudicatory rights of pesticide product registrants.
Title 3 of ECL article 33 vests the Commissioner with exclusive jurisdiction over "all matters pertaining to the distribution, sale, use and transportation of pesticides" (ECL 33-0303 [1]). Specifically, it authorizes the Commissioner "[t]o promulgate a list of restricted use pesticides and the usages of such pesticides that may be permitted subject to whatever conditions or limitations which the [C]ommissioner deems appropriate to fully protect the public interest" (ECL 33-0303 [3] [d]). A "restricted use pesticide" is defined as one "[w]hich the [C]ommissioner finds is so hazardous to man or other *389 forms of life that restrictions on its sale, purchase, use, or possession are in the public interest" (ECL 33-0101 [42] [b]). Additionally, the Commissioner is authorized to "adopt, promulgate and issue such rules and regulations as he [or she] may deem necessary to carry out and give full force and effect to the provisions of this article" (ECL 33-0303 [3] [e]).
Title 7 of article 33 governs registration of "[e]very pesticide which is used, distributed, sold, or offered for sale within this state or delivered for transportation or transported in intrastate commerce or between points within this state through any point outside this state" (ECL 33-0701). Registration is a prerequisite to a pesticide product's use, distribution, or sale in this State (id.). The Commissioner is required to register a pesticide if "the composition of the pesticide is such as to warrant the proposed claims for it, and if the pesticide and its labeling and other material * * * comply with the requirements of [the] article" (ECL 33-0709). An individual's registration of a pesticide may be canceled "whenever it does not appear that the article or its labeling or other material * * * complies with the provisions of this article" (ECL 33-0713 [1]). However, "[w]henever the [C]ommissioner determines that registration of a pesticide should be canceled" (ECL 33-0713), the registrant is entitled to certain procedural rights including notice (ECL 33-0713 [2]), time to make necessary corrections (ECL 33-0713 [3]); referral to an advisory committee (ECL 33-0715); and an adjudicatory public hearing (ECL 33-0717).

II.
Petitioners' main contentions on this appeal are that DEC lacks statutory authority to ban pesticide products by rule making, and, alternatively, that title 3 of ECL article 33 should not be read as authorizing a rule which would preclude current registrants of high concentration DEET products from challenging the underlying scientific bases for the DEET rule in their statutorily required adjudicatory cancellation of registration proceedings. We disagree with both assertions.
First, title 3 of ECL article 33, and particularly sections 33-0303 (3) (d) and (e), contain broad legislative delegations to the Commissioner to act against dangerous pesticides, even to ban them outright, by means of legislative rule making. Specifically, title 3 was enacted in 1970 as part of chapter 732 (L 1970, ch 732) which (1) defined a restricted use pesticide *390 (ECL 33-0101 [42] [b] [Agriculture and Markets Law former § 148 (22) (B)]); (2) gave the Commissioner authority to "promulgate a list of restricted use pesticides and the usages of such pesticides that may be permitted subject to whatever conditions or limitations which the [C]ommissioner deems appropriate to fully protect the public interest" (ECL 33-0303 [3] [d] [Agriculture and Markets Law former § 150 (1) (4)]); and (3) created a permit system as the exclusive means of selling, using or possessing restricted use pesticides (ECL 33-0901 [Agriculture and Markets Law former § 149]).
Supporting the express language of chapter 732, the legislative history clearly indicates an intent to authorize a complete ban on the use of dangerous pesticides under certain circumstances. The Executive Memorandum in support of chapter 732 states that the "Commissioner may refuse to issue * * * a permit [for the sale, purchase, possession or use of a restricted use pesticide] for a number of reasons, including * * * failure to comply with the law or rules and regulations, and inadequate knowledge or experience concerning the use and application" thereof (Mem of State Executive Dept, 1970 McKinney's Session Laws of NY, at 2987). And in the Governor's Message of Approval of chapter 732, he stated that a permit to sell or use a restricted use pesticide "must [be] refuse[d] * * * for use of a particular pesticide if there is a reasonable, less dangerous alternative available, capable of performing the task required" (1970 NY Legis Ann, at 513 [emphasis in original]).
Thus, both the express statutory language and the legislative history of chapter 732 of the Laws of 1970 contradict the petitioners' suggestion, adopted by the dissent, that title 3 of ECL article 33 was intended merely to "improve the Commissioner's ability to control misuse of registered pesticides by sellers, distributors, farmers, and other applicators." (Dissenting opn, at 402.)
We are similarly unpersuaded by petitioner's alternative argument, adopted by the dissent, construing ECL article 33 to prevent the exercise of the Commissioner's rule-making power in a way that would resolve factual issues that would otherwise be litigated in an adjudicatory registration cancellation hearing under title 7, e.g., whether high concentrations of DEET are unsafe.
Under settled principles of administrative law, a regulation adopted in a legislative rule-making proceeding can indeed *391 foreclose litigation of issues in later statutorily required individual adjudicatory proceedings. Thus, as stated by a leading authority on administrative law:
"A legislative rule can have the effect of eliminating what otherwise would be a party's right to a hearing to resolve contested issues of fact. A rule can have this effect by redefining the nature of a substantive right in a manner that makes the right no longer contingent on resolution of those factual issues. Indeed, this may be the single most important effect of legislative rules. Many agencies employ them routinely to serve this purpose." (1 Davis and Pierce, Administrative Law § 6.5, at 250 [3d ed].)
Thus, precisely opposite to the position urged by petitioners, the general administrative law principle is that a regulation adopted in a legislative rule-making proceeding, such as the DEET rule, can apply to foreclose litigation of issues in any individual adjudicatory proceeding provided for under the enabling legislation. The Supreme Court reaffirmed this doctrine in Mobil Oil Exploration v United Distrib. (498 US 211, 228):
"Time and again, `[t]he Court has recognized that even where an agency's enabling statute expressly requires it to hold a hearing, the agency may rely on its rulemaking authority to determine issues that do not require case-by-case consideration.' Heckler v. Campbell, [461 US 458, 467]; Permian Basin, [390 US 747, 774-777]; FPC v. Texaco Inc., 377 U. S. 33, 41-44 (1964); United States v. Storer Broadcasting Co., 351 U. S. 192, 205 (1956). The Commission's approval conditions establish, and its findings confirm, that the abandonment at issue here is precisely the type of issue in which `[a] contrary holding would require the agency continually to relitigate issues that may be established fairly and efficiently in a single rulemaking proceeding.' Heckler v. Campbell, supra, at 467."
That petitioners have a cognizable economic interest in their pesticide product registrations does not change this result. A registration is for administrative law purposes nothing more than a license or "similar form of permission required by law" (State Administrative Procedure Act § 102 [4]), *392 in this case, permission to sell or otherwise distribute a pesticide product. The case law is absolutely clear that statutory rights to a full adjudicatory hearing before denial or withdrawal of all such forms of permission may be trumped by the exercise of agency rule-making authority (see, Weinberger v Hynson, Westcott & Dunning, 412 US 609 [as to statutory adjudicatory hearing required before agency withdrawal of approval of new drug marketing application]; Federal Power Commn. v Texaco, 377 US 33 [as to adjudicatory hearing required before denial of a certificate of public convenience and necessity to sell natural gas]; United States v Storer Broadcasting Co., 351 US 192 [as to adjudicatory hearing required before denial of a broadcasting license]; Air Line Pilots Assn. v Quesada, 276 F.2d 892 [2d Cir] [as to adjudicatory hearing required before cancellation of a commercial airline pilot's license]). New York decisional law is completely consistent with these authorities (see, Matter of Kupferman v New York State Bd. of Social Welfare, 60 AD2d 674, affd on opn below 47 N.Y.2d 738; Matter of Parochial Bus Sys. v Parker, 40 AD2d 1062, appeal dismissed 32 N.Y.2d 901 [citing Air Line Pilots Assn. v Quesada, supra]).
Moreover, none of the enabling statutes at issue in these cases contained an express delegation of authority to make rules that settle factual issues that otherwise would be litigated in an adjudicatory hearing. Rather each contained a broad grant of rule-making authority with a fact-finding component. Similarly, article 33 gives the Commissioner authority to promulgate a list of restricted use pesticides (ECL 33-0303 [3] [d]) which are, by definition, "pesticide[s] * * * [w]hich the Commissioner finds [are] so hazardous to man or other forms of life that restrictions on [their] sale, purchase, use, or possession are in the public interest" (ECL 33-0101 [42] [b] [emphasis added]). Thus the legislatively authorized power to declare a pesticide restricted is necessarily a fact-finding power vested in the Commissioner, which is in this way no different from the rule-making powers at issue in the abovecited cases.
Nor does the legislative history to the various provisions of article 33 compel a deviation from the basic rule that a broad grant of rule-making power standing side-by-side with individual adjudicatory rights in an enabling statute  each with its own distinctive role  includes the power to resolve by rule making a question of fact that would otherwise be at issue in an adjudicatory proceeding. Petitioners argue that because *393 ECL article 33 was intended to conform with the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) (7 USC §§ 136-136y), and under FIFRA the Administrator may not decide by rule issues of safety and effectiveness of a pesticide, the Commissioner may not make such determinations under article 33. We find this argument unpersuasive.
To begin with, FIFRA contains no statutory counterpart to the specific rule-making power to restrict or limit pesticide use under ECL 33-0303 (3) (d) and title 9 of ECL article 33, without any kind of adjudicatory hearing. In this very significant respect, the ECL has no "parallel" in FIFRA (dissenting opn, at 406). Also, in contrast to the New York statutory scheme, the Environmental Protection Agency's (EPA) authority under FIFRA to designate a pesticide product as a restricted use pesticide is exclusively limited to classifying restricted use for registration purposes (7 USC § 136a [d] [1] [A]), and under FIFRA a change in classification to restricted use with respect to a previously registered pesticide gives rise to all of the same adjudicatory remedies as does a cancellation of registration (7 USC § 136a [d] [2]). There are no comparable provisions in the New York statutory scheme.
Moreover, all of the legislative history of ECL article 33 pointing to its conformity with FIFRA emanates from enactment of the predecessor version of title 7 of article 33 in 1965, a year after FIFRA was amended in substantially its present form (L 1965, ch 228, amending Agriculture and Markets Law former § 149-a). On the other hand, the provisions of title 3 of article 33 upon which DEC relies for rule-making authority to ban the use of pesticides containing more than 30% DEET were added five years later in 1970 (L 1970, ch 732, amending Agriculture and Markets Law former art 11). That history is indicative that the Legislature intended to create an independent, new, swift and decisive means to restrict and in some instances prohibit the uses of dangerous pesticides. Thus, the Assembly Sponsor stated, "[p]assage of this bill presents the quickest legal way for the future to place persistent pesticides under complete control" (Letter from Member of Assembly Hardt, Bill Jacket, L 1970, ch 732, at 1). The most pertinent legislative history of the enabling statute here, therefore, not only fails to support petitioners' interpretation, it actually contradicts it.
The dissenters appear to have a different interpretive theory upon which to base their argument that the Commissioner's *394 rule-making power under title 3 does not extend to foreclose any factual issues in a registration cancellation adjudicatory hearing, allowing relitigation  and possibly inconsistent results  of rule-making determinations with registrants' individual proceedings. Essentially pointing to language in and legislative history of title 7 regarding its conformity to FIFRA, the dissent argues that the omission in title 3 of the FIFRA procedural rights of a registrant before its product can be designated a restricted use pesticide was an unintended legislative oversight (dissenting opn, at 406) which this Court can remedy by implying the FIFRA advisory committee and adjudicatory procedures through statutory interpretation. This theory is flawed in several respects. First, it anomalously applies the legislative history of the 1965 title 7 State pesticide registration statute to interpret a statutory agency rule-making authority to ban dangerous pesticides enacted five years later. It also violates any number of canons of statutory construction. "[N]ew language cannot be imported into a statute to give it a meaning not otherwise found therein" (McKinney's Cons Laws of NY, Book 1, Statutes § 94, at 190). Moreover, "a court cannot amend a statute by inserting words that are not there, nor will a court read into a statute a provision which the Legislature did not see fit to enact" (id., § 363, at 525). Also, an "inference must be drawn that what is omitted or not included was intended to be omitted and excluded" (id., § 240, at 412).[1]
In sum, title 3 confers broad rule-making authority on the Commissioner. Acting pursuant to this authority, the Commissioner has promulgated a rule of general applicability which bans DEET in high concentrations. The Commissioner has not, however, canceled the registrations of high concentration DEET products. To do so, we all agree, he must act pursuant to title 7 cancellation of registrations procedures. In title 7 proceedings petitioners can raise issues, including scientific issues, particularly affecting them, but cannot relitigate the underlying issue already determined by the Commissioner exercising his rule-making authority.
*395 This result gives full effect to title 3 and title 7, and flows naturally from a reading of article 33 in its entirety. It does not eviscerate, modify, bypass, override or repeal (expressly or impliedly) title 7. Rather title 7 remains the only means by which the Commissioner may cancel an existing registration. In those proceedings, petitioners may challenge whether their product "or its labeling or other material required to be submitted complies with [article 33]" (ECL 33-0713 [1]) through an adjudicatory hearing, by seeking the opinion of an advisory committee, or both. Thus cancellation need not be automatic, and undoubtedly individual issues may sometimes be scientific. Registrants may not, however, challenge and relitigate the rules that have been validly promulgated pursuant to a separate provision of article 33. They are bound by those rules  just as other registrants, the agency itself and the general public are bound by those rules.
Thus we adhere to the holding of the Appellate Division, that the registrations of high DEET concentration products must be canceled through the title 7 process, but that in such proceedings the scientific validity of the DEET rule may not be challenged because that holding is completely consistent with doctrine, precedent and the enabling statute.

III.
Two of petitioners' remaining objections to the DEET rule, i.e., that it is irrational and arbitrary and capricious and in violation of SEQRA (ECL art 8), are refuted by the same detailed factual submissions by the Commissioner contained in the record. Therefore, we shall address them together.
DEC's background documents and assessment of public comments detail 44 scientific studies and empirical data that indicate that use of high concentration DEET products may cause adverse health effects. In addition, the affidavit of Nancy Kim, PhD, the State Department of Health Director of the Division of Environmental Health Assessment, fully explains and documents the ample support for the conclusion that DEET in concentrations above 30% is dangerous to health, particularly to that of children. Specifically, the conclusion that high concentration DEET products are dangerous to children is supported by a World Health Organization technical report prepared by an expert committee on vector biology, an EPA published book (Morgan, Recognition and *396 Management of Pesticide Poisoning [4th ed]),[2] a United States Department of Defense study, a professor at Harvard School of Public Health, the medical directors of various poison control centers, and health officials from New Jersey, Connecticut, Massachusetts and Maine. Moreover, as Dr. Kim pointed out, petitioners, although invited to do so, provided no credible evidence to support their claims that a higher concentration of DEET would significantly increase its effectiveness as a deer tick repellant.
The affidavits of Dr. Kim and Dr. Dennis White, Director of the Arthropod-borne Disease Program and Director of the Tick-Borne Disease Institute for the State of New York, as well as the report by the Bureau of Toxic Substances Assessment of the New York State Department of Health, establish that the agency evaluated the dangers to health of higher concentrations of DEET, the evidence that the mosquito-repellant effectiveness of DEET in higher concentrations than 30% was not significantly enhanced, the evidence that low concentrations of DEET are 90% effective against ticks when used on clothing, and the lack of hard evidence one way or the other regarding DEET's effectiveness against deer ticks when used on human skin in high concentrations.
This Court's role in reviewing an agency action is not to determine if the agency action was correct or to substitute its judgment for that of the agency, but rather to determine if the action taken by the agency was reasonable (see, Matter of Pell v Board of Educ., 34 N.Y.2d 222, 230-235; New York State Assn. of Counties v Axelrod, 78 N.Y.2d 158, 166). Thus, the foregoing demonstrates that the record here contains sufficient evidence to provide a rational basis for the Commissioner's conclusion that possible detrimental side effects from the human use of high concentration DEET products outweigh possible benefits from their use. The Commissioner, therefore, did not act arbitrarily and capriciously in promulgating the DEET rule.
Moreover, petitioners' claim that DEC violated SEQRA by issuing a Determination of Non-Significance with regard to the environmental impact of the DEET rule also fails. It is well settled that "[i]n reviewing * * * SEQRA determinations *397 * * * we are limited to considering `whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion'" (Chinese Staff & Workers Assn. v City of New York, 68 N.Y.2d 359, 363 [quoting CPLR 7803 (3)]). Thus, we may not question the "desirability of any action or choose among alternatives, but [we must] assure that the agency itself has satisfied SEQRA, procedurally and substantively" (Matter of Jackson v New York Urban Dev. Corp., 67 N.Y.2d 400, 416). The relevant question before us, then, is whether the respondents "identified the relevant areas of environmental concern, took a `hard look' at them, and made a `reasoned elaboration' of the basis for their determination" (Chinese Staff & Workers Assn. v City of New York, supra, at 363-364). And although the requirement to produce an environmental impact statement is triggered by a relatively low threshold  if the action may have a significant effect on the environment (see, id., at 364-365)  "[a] conditional negative declaration is properly issued when the agencies have made a thorough investigation of the problems involved and reasonably exercised their discretion" (id., at 364; see also, Matter of United Petroleum Assn. v Williams, 102 AD2d 491, affd 65 N.Y.2d 708).
The record here, particularly the Kim and White affidavits and documents referred to therein as previously discussed, amply demonstrates that DEC identified the relevant area of environmental concern (the alleged possibility that the DEET rule could enhance the incidence of vector-borne Lyme Disease), and took a hard look at all the evidence available on the issue. Having taken this hard look, DEC could reasonably conclude that the DEET rule would not cause any significant environmental impact. That DEC considered the concern raised by petitioner's submissions is evidenced by the DEC's revised negative declaration, made after the legislative rule-making public hearing, which gave a reasoned elaboration of its determination that the DEET rule would have no significant impact on the environment. Thus, DEC established full compliance with statutory and court-imposed SEQRA requirements (see, Matter of Jackson v New York Urban Dev. Corp., 67 N.Y.2d 400, 417, supra).
Thus we also reject the dissent's SEQRA argument. In accusing DEC of failing to comply with SEQRA, the dissent appears to place the burden on DEC to demonstrate factually that higher concentrations of DEET would not be more effective against the spread of Lyme Disease. However, such a *398 burden has never been imposed by SEQRA. DEC was not required to accept as true the assertions by chemical industry retained experts  which were unsupported by any responsible scientific study  that the DEET rule could have an impact on the incidence of Lyme Disease. Moreover, the dissent fails to identify any empirical scientific data submitted by petitioners which DEC overlooked in its SEQRA determination.

IV.
Finally, there is no merit to petitioners' Commerce Clause argument. First, FIFRA (7 USC § 136v) delegates to States the authority to regulate the sale and use of pesticides. "Where state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce" (White v Massachusetts Council of Constr. Empls., 460 US 204, 213; see also, Southern Pac. Co. v Arizona, 325 US 761, 769). Moreover, States may act to regulate matters of legitimate local concern even though such regulation affects interstate commerce (Maine v Taylor, 477 US 131, 138). The regulation at issue here was enacted in the interest of public health and safety  obviously legitimate local concerns  and, concededly does not discriminate between in-State and out-of-State manufacturers and distributors. Petitioners have made no showing that "the burden imposed on commerce is clearly excessive in relation to the putative local benefits" (Pike v Bruce Church, 397 US 137, 142), and their bare allegation that the DEET rule imposed an undue burden on interstate commerce is insufficient to render the rule unconstitutional (see, Pharmaceutical Mfrs. Assn. v Whalen, 54 N.Y.2d 486, 495). The constitutionality of the rule should, therefore, be sustained.
Accordingly, the order of the Appellate Division should be affirmed, with costs.
CIPARICK, J. (dissenting).
We are all in agreement that the Commissioner may restrict the use of DEET in high concentrations. We also agree that registrations for pesticide products not in compliance with the proposed DEET concentration rule must be cancelled pursuant to title 7. We differ with the majority concerning the nature and content of the title 7 cancellation proceedings. Specifically, the majority holds that the scientific issues underlying the DEET rule may not be "relitigated" during title 7 proceedings once they have been aired at an informal public rule-making hearing. Our analysis *399 of article 33 as a whole leads us to conclude that permitting the Commissioner to resolve complex scientific policy questions on the basis of the data developed at only a rule-making hearing would be inimical to the Legislature's considered approach to pesticide regulation. Accordingly, we respectfully dissent.
By letter dated May 22, 1991, the Department of Environmental Conservation's Bureau of Pesticide Management (DEC) informed DEET product registrants of its intention to amend 6 NYCRR part 326 to limit the registration of personal use insect repellant products containing DEET to those containing 30% or less of the pesticide. On July 23, 1991, DEC held a public hearing on the proposed DEET rule, at which time eight persons spoke in favor of the continued availability of high concentration DEET products. Only DEC's representative spoke in favor of the proposed rule. Written comments were subsequently submitted to DEC.
On April 3, 1992, DEC issued its Notice of Adoption of the proposed rule, modified only to the extent of raising the permissible DEET concentration level from 30% to 33.33% for controlled-release formulations.[1] Shortly thereafter, affected DEET registrants were advised that their product registrations would be cancelled for noncompliance effective May 11, 1992.
Pursuant to title 7 of ECL article 33, the affected registrants requested that DEC refer the cancellation decision to an independent expert advisory committee for their review and commentary on the underlying scientific issues. DEC denied the request, stating that title 7 does not provide for advisory committee review when the Commissioner acts pursuant to its title 3 rule-making authority.
Petitioners commenced this proceeding seeking declaratory and injunctive relief. Supreme Court concluded that DEC was *400 not authorized to cancel products by rule making and declared the DEET rule invalid. The Appellate Division modified, declaring that 6 NYCRR 326.2 (b) (10), the DEET rule, "has not been shown to be invalid." Although the Court concluded that DEC must comply with title 7 when cancelling registrations of noncomplying products, it held that registrants "cannot challenge the validity of the DEET regulation" in the title 7 proceedings (197 AD2d 314, 320).
Petitioners appealed to this Court on constitutional grounds. Implementation and enforcement of the DEET rule has been stayed pending a final determination of this appeal.
Statutory Scheme
The Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) (7 USC §§ 136-136y), as administered by the Environmental Protection Agency (EPA), comprehensively regulates pesticides at the Federal level. The EPA is authorized to give notice of its intent to cancel a pesticide registration, "If it appears * * * that a pesticide * * * does not comply with * * * [FIFRA] or * * * generally causes unreasonable adverse effects on the environment" (7 USC § 136d [b]). "Noncompliance" determinations involve a risk/benefit analysis which balances the environmental, economic, and social costs and benefits associated with continued use of a pesticide (see, Environmental Defense Fund v Environmental Protection Agency, 489 F.2d 1247, 1250-1252).
ECL article 33, which is expressly modeled after FIFRA, regulates pesticides at the State level. Like FIFRA, ECL article 33 embodies a balanced risk/benefit approach to pesticide regulation (see, ECL 33-0301).[2] The ECL expressly provides that "it is desirable that there should be uniformity between the requirements of the several states and the federal *401 government relating to pesticides" (ECL 33-0303 [4]; Weinberg, Practice Commentary, McKinney's Cons Laws of NY, Book 17½, ECL art 33, at 656 [art 33 and FIFRA should be read in conjunction]). Accordingly, DEC's regulations provide that, except in the case of a conflict, "the rules and regulations applicable to and in conformity with the primary standards established by article 33 of the Environmental Conservation Law shall be those promulgated pursuant to [FIFRA]" (6 NYCRR 320.1).
Title 3
Title 3 of ECL article 33 vests the Commissioner with exclusive jurisdiction over "all matters pertaining to the distribution, sale, use and transportation of pesticides" (ECL 33-0303 [1]). This delegation of power includes authorization to "promulgate a list of restricted use pesticides and the usages of such pesticides that may be permitted subject to whatever conditions or limitations which the commissioner deems appropriate to fully protect the public interest" (ECL 33-0303 [3] [d]).[3] The Commissioner is authorized to "adopt, promulgate and issue such rules and regulations as he may deem necessary to carry out and give full force and effect to the provisions of this article" (ECL 33-0303 [3] [e]).
The declared purpose of title 3 was "[t]o make it unlawful for any person to distribute, sell, offer to sell, purchase, possess or use without a permit a `restricted use pesticide'" (Mem of State Executive Dept, 1970 McKinney's Session Laws of NY, at 2986). Title 3 augmented the Commissioner's powers as they related to registered pesticides classified as "restricted use", requiring sellers and distributors of such pesticides to obtain "commercial permits", and persons purchasing them for actual use to obtain "purchase permits" (id.; Letter from Member of Assembly Hardt, Bill Jacket, L 1970, ch 732, at 1). The Commissioner was authorized to revoke and to refuse to issue commercial and purchase use permits. Enforcement was "strengthened generally" by permitting the Commissioner to seize a restricted use pesticide for which a permit had not been issued as well as by permitting the suspension of a *402 pesticide registration presenting an imminent hazard to the public (Executive Mem, op. cit., at 2987). Thus, title 3 was enacted to improve the Commissioner's ability to control misuse of registered pesticides by sellers, distributors, farmers, and other applicators. It does not address the cancellation of pesticide registrations.
Title 7
From 1947 through 1963, the United States Department of Agriculture (USDA), the former administering agency of FIFRA, lacked the authority to refuse to register or cancel a pesticide (see, Pub L 80-104, 61 US Stat 163, 168). In 1964, Congress amended FIFRA to authorize USDA to deny or cancel Federal pesticide registrations, subject to advisory committee review and an adjudicatory hearing. In 1965, to ensure uniformity with FIFRA, the New York Legislature similarly amended the predecessor version of ECL article 33 (Agriculture and Markets Law former art 11). The 1965 amendments (L 1965, ch 228) authorized the Commissioner to deny or cancel a pesticide registration whenever the product or its labeling did not comply with the provisions of article 11 (now ECL art 33) (see, Mem of Joint Legis Comm on Natural Resources, 1965 NY Legis Ann, at 84-85).
As with the virtually identical Federal amendments, a registrant affected by the Commissioner's noncompliance decision was afforded certain procedural rights. Under title 7 of ECL article 33, whenever the Commissioner determines that a pesticide registration should be cancelled, the registrant, within the prescribed 30-day time period, may (1) make necessary corrections (ECL 33-0713 [3]); (2) file a petition requesting that the matter be referred to an advisory committee comprised of qualified experts who will review the relevant data and submit to the Commissioner a report and recommendation regarding the proposed cancellation (ECL 33-0715); or (3) the registrant may file objections and request an adjudicatory public hearing before an Administrative Law Judge (ECL 33-0717). The Commissioner may accept, reject, or modify the recommendations of the advisory committee or Administrative Law Judge (id.). The Commissioner's final determination may be challenged pursuant to CPLR article 78 (ECL 33-0721).
The scientific advisory mechanism created by the 1965 amendments manifests the Legislature's intention of striking a proper balance between preservation of the public safety and assurance of due process to registrants in situations *403 involving cancellation for noncompliance: "The authorization for an advisory committee is in furtherance of fair and equitable Ztreatment of applicants, and the people of the state, represented by the Commissioner" (Mem of Joint Legis Comm on Natural Resources, 1965 NY Legis Ann, at 85). Title 7 fulfills another, more critical function in the over-all scheme of article 33  it provides DEC with objective technical data to assist it in weighing the risks and benefits associated with continued use of a particular pesticide, thus insuring that DEC acts on a sound, scientifically informed basis. Clearly, title 7's purpose was the promotion of informed administrative decision-making and judicial review:
"The scientific knowledge and impartial evaluation of a pesticide by such a[n advisory] committee can only be for the best interests of all.
"The administrative procedural steps provided and required by the bill insure an applicant or registrant a full hearing and consideration, and will protect and safeguard the health, welfare and safety of the public" (Letter from Commissioner Wickham to Honorable Sol Corbin, petitioner's Appendix, at A-26 [emphasis added]; see, Mem of Joint Legis Comm on Natural Resources, 1965 NY Legis Ann, at 85; 3 Rodgers, Environmental Law, Pesticides and Toxic Substances § 5.2 [B] [2] [purpose of science advisory apparatus was to strengthen technical input to agency and bring a fresh, credible perspective to disputed scientific issues, which would aid judicial review]).
Thus, in plain, compulsory language, title 7 clearly gives any person adversely affected by a notice of cancellation the right to request a hearing on the matter. Title 7 constitutes the only legislative statement directly addressing the precise issue we confront today  cancellation of existing pesticide registrations.
Title 3/Title 7 Interplay
As the majority correctly observes, generally an agency can promulgate a legislative rule which eliminates the justification for a statutorily prescribed adjudicatory hearing on factual issues (see, Mobil Oil Exploration v United Distrib., 498 US 211, 228). However, the majority interprets and applies this principle as if no exceptions are possible. To begin with, it is fundamental that an agency has the power to issue binding *404 legislative rules only if and to the extent Congress has authorized it to do so (see, Mobil Oil, supra, at 223; United States v Storer Broadcasting Co., 351 US 192, 202-203; 1 Davis and Pierce, Administrative Law § 6.3, at 234 [3d ed]).
In this case, it is undisputed that title 3's general rule-making authority does not expressly empower the Commissioner to bypass title 7 and cancel pesticide registrations based only on an informal public rule-making hearing. The majority, in imputing this power to the Commissioner, has accorded the agency unprecedented deference. That an agency possesses rule-making authority does not end all inquiry; it is still appropriate to examine whether an agency may lawfully override legislative mandates contained in complementary portions of the enabling statute (see, 1 Davis and Pierce, Administrative Law § 6.3, at 235 [3d ed]; see also, Matter of Campagna v Shaffer, 73 N.Y.2d 237, 242-243:
"Agencies, as creatures of the Legislature, act pursuant to specific grants of authority conferred by their creator. In discharging responsibilities, an agency is `clothed with those powers expressly conferred by its authorizing statute, as well as those required by necessary implication [citations omitted]. Where an agency has been endowed with broad power to regulate in the public interest, we have not hesitated to uphold reasonable acts on its part designed to further the regulatory scheme' [Matter of City of New York v State of New York Commn. on Cable Tel., 47 N.Y.2d 89, 92]. It is correspondingly axiomatic, however, that an administrative officer has no power to declare through administrative fiat that which was never contemplated or delegated by the Legislature. An agency cannot by its regulations effect its vision of societal policy choices [Matter of Consolidated Edison Co. v Department of Envtl. Conservation, 71 N.Y.2d 186, 191-192; Boreali v Axelrod, 71 N.Y.2d 1, 9], and may adopt only rules and regulations which are in harmony with the statutory responsibilities it has been given to administer.").
The majority, without analyzing title 7's place in the overall scheme of ECL article 33, has invested the Commissioner with the very power being contested today, even while relying on case law that recognizes the need to examine the entire *405 enabling statute in instances where the scope of the agency's legislatively prescribed authority is in doubt:
"It is well established that our task in interpreting separate provisions of a single Act is to give the Act `the most harmonious, comprehensive meaning possible' in light of the legislative policy and purpose. Clark v. Uebersee Finanz-Korp., [332 US 480, 488]; see United States v. Bacto-Unidisk, 394 U.S. 784, 798." (Weinberger v Hynson, Westcott & Dunning, 412 US 609, 631-632.)
In this case, the majority diminishes the significance of title 7's legislative policy and purpose. In turn, it attributes inflated significance to title 3 on the ground that "the specific rule-making power to restrict or limit pesticide use under ECL 33-0303 (3) (d)" finds no statutory counterpart in FIFRA (majority opn, at 393). However, the majority proceeds from a flawed premise. FIFRA does indeed provide rule-making authority to ban pesticides.
7 USC § 136a (d) (2) provides:
"(2) Change in classification. If the Administrator determines that a change in the classification of any use of a pesticide from general use to restricted use is necessary to prevent unreasonable adverse effects on the environment, he shall notify the registrant of such pesticide of such determination at least [45] days before making the change and shall publish the proposed change in the Federal Register. The registrant, or other interested person with the concurrence of the registrant, may seek relief from such determination under section [136d (b)] of this title."
The implementing regulation, 40 CFR 152.140, entitled "Classification of pesticide products", provides:
"FIFRA sec. 3(d) authorizes the Agency, as part of the registration or reregistration of a pesticide, or by issuing a regulation, or by an order under FIFRA sec 6 [7 USC § 136d, which contains the cancellation authority and scientific review safeguards], to classify a product, its uses, or a class of products or uses for restricted use, in accordance with the criteria and procedures in subpart I of this part." (Emphasis added.)
*406 40 CFR 152.160, which deals with the scope of classification of pesticides further provides in subdivision (b):
"Kinds of restrictions. The Agency may restrict a product or its uses to use by a certified applicator, or by or under the direct supervision of a certified applicator, as described in FIFRA sec. 3 (d) (1) (C). The Agency may also, by regulation, prescribe restrictions relating to the product's composition, labeling, packaging, uses, or distribution and sale, or to the status or qualifications of the user." (Emphasis added.)
Manifestly, the EPA is authorized to promulgate a regulation changing the classification of a pesticide from general to restricted use, thus restricting, or even banning, the use, sale or distribution of a pesticide product where there is a substantial question about its safety. This is exactly the course of action the Commissioner of DEC has pursued in this case. Thus, contrary to the majority's observation, FIFRA and ECL are structurally parallel. The principal difference is that while FIFRA explicitly makes the EPA Administrator's change of classification rule-making authority subject to the cancellation and scientific review procedures contained in 7 USC § 136d, title 3 is silent in this respect.
Evidently, the Legislature did not contemplate that a change of classification by title 3 rule making would in some cases automatically effect the cancellation of existing registrations for pesticide products. We have ample, highly persuasive authority to fill this vacuum  FIFRA, upon which ECL article 33 is modeled, and which provides for cancellation proceedings, including scientific review, when a pesticide is banned by rule. Title 3 and DEC's own regulations provide that, for purposes of uniformity, FIFRA's regulations must fill the gaps of New York's statutory scheme (see, ECL 33-0303 [4]; 6 NYCRR 320.1 ["the rules and regulations applicable to and in conformity with the primary standards established by article 33 of the Environmental Conservation Law shall be those promulgated pursuant to (FIFRA)"]).
Indeed, the majority's formulation works a conflict against FIFRA, and leaves New York's Commissioner of DEC to resolve complex policy questions on the frontiers of scientific knowledge based only on the evidence developed at a generic public rule-making hearing. The Legislature, in adopting the remarkably detailed procedural requisites contained in title 7, *407 recognized that specialized expertise is required when making pesticide cancellation decisions. The risks to both registrants and the public at large attendant to the majority's evisceration of title 7, which promotes agency accuracy, are manifest.
Our task in the face of legislative silence and ambiguity concerning the proper interplay of different provisions of a single act is to construe the provisions in a manner that furthers the over-all policy and purpose of the entire statute (see, Matter of Bookhout v Levitt, 43 N.Y.2d 612, 617 [it is an "elementary canon of statutory construction that all parts of a statute be read and construed together to determine legislative intent"]). Titles 3 and 7 are important components of a single, integrated statutory scheme embodying a balanced risk/benefit approach to pesticide regulation. The two provisions can and should be construed harmoniously in the context of article 33 as a whole. Consequently, we cannot join in the executive-judicial excision of the Legislature's carefully constructed framework for informed resolution of complex scientific policy questions. The majority's resolution, premised on automatic deference to generic rule-making authority, is simply unsound.
In our view, the majority also errs in repealing title 7 by implication. In Matter of Consolidated Edison Co. v Department of Envtl. Conservation (71 N.Y.2d 186, 195), we stated:
"Generally, a statute is not deemed impliedly modified by a later enactment `"unless the two are in such conflict that both cannot be given effect. If by any fair construction, a reasonable field of operation can be found for [both] statutes, that construction should be adopted"'. `These principles apply with particular force to statutes relating to the same subject matter, which must be read together and applied harmoniously and consistently'" ([emphasis added and citations omitted]; see, McKinney's Cons Laws of NY, Book 1, Statutes § 391; Matter of Natural Resources Defense Counsel v New York City Dept. of Sanitation, 83 N.Y.2d 215, 222-223).
We are unable to accept the other major premise supporting the majority's holding  that the complex science policy issues implicated by the DEET concentration rule were somehow adequately "litigated" during the public rule-making hearing. The rule-making hearing which the majority considers sufficient *408 for resolution of the issues implicated by the DEET rule is but an informal process whereby the public is provided with notice of the terms or substance of the agency's proposal; the public is given an opportunity to comment on the proposal; and the agency then provides its reasons for adopting its final rule together with its responses to the public comments.
In this case, registrants, manufacturers and other agencies were also invited to submit comments on the proposed rule. However, the public hearing lasted 1 hour and 45 minutes. Eight people testified in favor of continued availability of high concentration DEET products, and the only person speaking in favor of the DEET rule at the meeting was DEC's representative, who was not subject to cross-examination. In short, there was never a true opportunity to "litigate" in this case, i.e., to probe and test the scientific evidence supporting the DEET rule, including the potential adverse effects on the Lyme Disease epidemic attendant to depriving the public of the highest concentrations of the only effective repellant against the ticks which spread the disease.[4] Nor did the Commissioner's informal rule-making hearing elicit the independent and comprehensive technical input the Legislature has stated is necessary for informed cancellation decisions under article 33.
It must be kept in mind that the procedural requisites at issue in this case are conceptually unique. The Commissioner is not just resolving disputed factual issues through rule making. The Commissioner is deciding complex, mixed questions of science and policy that require balancing the environmental, social, and economic costs and benefits of continued use of high concentration DEET products. The science advisory apparatus assists the Commissioner in this difficult process, providing it with technical input from an expert, neutral body, thus ensuring that the Commissioner's DEET cancellation *409 decision is premised on adequate data and embodies coherent public policy.
It is clear that title 7's express, preexisting, statutory procedural safeguards are of a completely different nature and historical development than the generic "due process" hearing rights at issue in the cases relied upon by the majority (see, e.g., Mobil Oil Exploration v United Distrib., 498 US 211, supra ["due hearing"]; Heckler v Campbell, 461 US 458 [Social Security disability hearing]).
In summary, we reject the majority's reading of article 33, which virtually eliminates the core of title 7  scientific review  and reduces cancellation proceedings to a pro forma rubber stamping process in those instances where DEC has promulgated a rule requiring the cancellation of registrations. We would hold that, although the Commissioner may promulgate a regulation completely restricting the use of a pesticide, it must also satisfy title 7's scientific review requirements when cancelling existing pesticide registrations not in compliance with the proposed rule.
Our construction of what the Legislature intended and enacted would not impede the Commissioner's ability to protect the public safety. If DEC concludes that the public or environment are imminently threatened by continued use of a pesticide, under the explicit terms of title 7, DEC may immediately suspend registrations for products containing that pesticide pending completion of cancellation proceedings (ECL 33-0719). Nor would we subordinate title 3 to title 7. Rather, in light of the important but potentially conflicting interests embodied by the two provisions, and the Legislature's silence concerning their interplay, the preferred construction should be one that furthers the Legislature's over-all approach to pesticide regulation, which places great value on reasoned, informed decision making (see, Matter of Bookhout v Levitt, 43 N.Y.2d 612, supra). Under controlling principles of administrative law, DEC would continue to be entitled to judicial deference, even where the record is susceptible of conflicting inferences from the scientific evidence adduced. Finally, our construction would preserve harmony with FIFRA, which provides for scientific review and public hearings in all cancellation cases, including where, as here, a ban on a generic active ingredient requires mass cancellations of product registrations (cf., 7 USC § 136d [b]; 40 CFR 164.20; see, e.g., Love v Thomas, 858 F.2d 1347; Environmental Defense Fund v Environmental Protection Agency, 465 F.2d 528, 532).
*410 SEQRA
The Commissioner of DEC violated SEQRA in issuing a negative declaration. The Appellate Division rejected petitioners' argument, stating merely that "the record establishes that the Commissioner identified the relevant areas of environmental concern, took a `hard look' at them and made a reasoned elaboration for the determination (see, Chinese Staff & Workers Assn. v City of New York, 68 N.Y.2d 359)." (197 AD2d, at 319.) However, this conclusion is without support in our case law (see, Matter of Jackson v New York State Urban Dev. Corp., 67 N.Y.2d 400, 417; Matter of Har Enters. v Town of Brookhaven, 74 N.Y.2d 524, 528-529). DEC failed to take a "hard look" at the ramifications of the DEET rule on Lyme Disease prevention.
The primary purpose of SEQRA is "to inject environmental considerations directly into governmental decision making" (Matter of Coca-Cola Bottling Co. v Board of Estimate, 72 N.Y.2d 674, 679). Under SEQRA, DEC was required to make an initial determination whether the DEET regulation "may have a significant effect on the environment" (ECL 8-0109 [2] [emphasis added]). If so, DEC was required to prepare an Environmental Impact Statement. It is settled that "[t]he threshold at which the requirement that an EIS be prepared * * * is relatively low: it need only be demonstrated that an action may have a significant effect on the environment" (Chinese Staff, supra, at 364-365 [emphasis added]; Onondaga Landfill Sys. v Flacke, 81 AD2d 1022; Weinberg, Practice Commentary, McKinney's Cons Laws of NY, Book 17½, ECL 8-0109, at 75).
In this case, medical and entomological experts opined that the DEET rule would limit the availability of DEET concentrations most effective against Lyme Disease (see, e.g., record on appeal, at 747-748 [statement of Dr. Durland Fish]; id., at 396 [statement of Dr. Kenneth Leigner, a physician specializing in Lyme Disease]). Dr. John A. Mulrennan, the Chief of the Bureau of Entomology and Pest Control of the Florida Department of Agricultural and Consumer Services, and one of the authors of a 1969 Vietnam DEET study upon which DEC relies in support of its rule, stated:
"it would be a mistake to limit the public to less than the most effective formulation of DEET available, particularly if you're basing your concerns on the research conducted by Dr. Lamberg and myself [involving 75% DEET concentrations in combat conditions]. * * *

*411 "The cases of [Lyme Disease and Eastern Encephalitis] are a real health problem. They pose significant risks to the public. Any public health threat posed by the use of DEET repellents pales by comparison" (record on appeal, at 457-458 [emphasis added]).
The authoritative statements in the record point out the magnitude of the very tangible public health threat presented by Lyme Disease. The record also reveals the current paucity of scientific knowledge concerning the tick-repelling-efficacy of DEET. Because of the lack of adequate studies, it is unknown what concentrations of DEET adequately protect humans against the ticks which spread Lyme Disease. DEC actually concedes this point and its lack of knowledge on the issue (see, Rep of Bureau of Toxic Substance Assessment of NY State Dept of Health, May 20, 1991, record on appeal, at 290). Nevertheless, DEC expects that it can issue a negative declaration in this case without conducting any preaction investigation of the potential adverse effects of removing high concentration DEET products from the market.
Similar agency efforts to ignore key, disputed issues have repeatedly been rejected in the past (see, e.g., Matter of Golten Mar. Co. v New York State Dept. of Envtl. Conservation, 193 AD2d 742, 743 [DEC did not examine area of environmental concern]; Purchase Envtl. Protective Assn. v Strati, 163 AD2d 596, 597-598 [Town Planning Board violated SEQRA when it failed to make a "coherent evaluation" of wetlands; moreover, Board's "hard look" obligation had to be made on the record and could not be delegated to expert consultants]; Matter of Desmond-Americana v Jorling, 153 AD2d 4, 10-11, lv denied 75 N.Y.2d 709 [negative declaration violated SEQRA because DEC conducted only "cursory examination" of impact its regulations establishing comprehensive system for prior notification of pesticide applications in the commercial lawn context would have on existing integrated pest management system]; Matter of Save the Pine Bush v Planning Bd., 130 AD2d 1 [Planning Board did not consider key question of the minimal acreage required for continued survival of Pine Bush ecology]; H.O.M.E.S v New York State Urban Dev. Corp., 69 AD2d 222, 232 [UDC failed to analyze traffic and parking problems its project entailed]).
DEC's obligation under the circumstances of this case was to perform a "thorough and meaningful review" (see, Matter of Desmond-Americana v Jorling, 153 AD2d 4, 11; *412 see also, Chinese Staff, supra, at 364). DEC conducted no such review. Despite the sharply disputed evidence in the record concerning the impact banning high concentration DEET products would have on the incidence of Lyme Disease, and DEC's conceded lack of knowledge on this issue, DEC answered the questions whether its action could result in any adverse environmental effects, or any controversies related thereto, with a single word  "No" (record on appeal, at 829). Later, in issuing a Revised Negative Declaration, DEC brushed aside with one conclusory sentence all of the authoritative statements and sharply disputed evidence pertaining to the possible increased danger of contracting Lyme Disease: "No increase in the incidence of vector-borne diseases is expected to result from this rule" (id., at 371).
In conclusion, DEC neither took a "hard look" at the relevant environmental concerns, nor made a reasoned elaboration of the basis for its declaration of nonsignificance (see, Chinese Staff, supra, at 364). Since DEC failed to satisfy SEQRA, the DEET regulation should be annulled (see, Inland Vale Farm Co. v Stergianopoulos, 104 AD2d 395, 396, affd 65 N.Y.2d 718; Desmond-Americana, supra, at 12).
Order affirmed, with costs.
NOTES
[1] Further demonstrating that title 3 was not intended to be inextricably linked to FIFRA is the legislative history which indicates that chapter 732 was particularly targeted against DDT, the Legislature clearly intending to impose severe restrictions on its sale and usage. Contrastingly, the EPA considered itself bound under FIFRA to move against DDT-based pesticides only through the slower, more cumbersome adjudicatory procedures of FIFRA for cancellation of their registrations (see, 37 Fed Reg 13,369-13,374 [July 7, 1972]).
[2] Specifically, the EPA book warns, "Great caution should be exercised in using DEET on children. Only the products containing the lower concentrations (usually 15%) should be used, and application should be limited to exposed areas of skin, using as little repellent as possible."
[1] As amended by DEC's new rule, 6 NYCRR 326.2 provides:

"(b) The following may be distributed, sold, purchased, possessed or used only upon issuance of a commercial permit or purchase permit for those purposes listed: * * *
"(10) DEET (N, N-diethyl-m-toluamide):
"(i) end use product formulations for use on humans are limited to concentrations of 30 percent or less DEET active ingredient; except controlled-release formulations (formulations which contain one or more ingredients intended to regulate the rate of release of active ingredients) are limited to concentrations of 33.33 percent or less DEET active ingredient; and (ii) all products are general use."
[2] ECL 33-0301 declares the Legislature's policy and purposes: "The purpose of this article is to regulate the registration, commercial use, purchase and custom application of pesticides. Pesticides, properly used for the control of insects, fungi, weeds and nematodes, and as defoliants, desiccants, and plant regulators and for related purposes, are valuable, important and necessary to the welfare, health, economic well-being and productive and industrial capabilities of the people of this state. However, such materials, if improperly used, may injure health, property and wildlife. It is hereby declared to be a matter of legislative determination that the regulation of the registration, commercial use, purchase and custom application of pesticides is needed in the public interest and that in the exercise of the police power all persons be required to register or obtain permits before engaging in such activities."
[3] Article 33 classifies pesticide products as either "restricted use" or "general use". Restricted use pesticides are defined as those which persist or accumulate in the environment and create a present or future risk of harm, or which "the commissioner finds is so hazardous to man or other forms of life that restrictions on its sale, purchase, use, or possession are in the public interest" (ECL 33-0101 [42] [b]).
[4] Title 7 is not a second bite at the apple given the procedural posture of this case. When registrants were invited to comment on the DEET rule they were not informed that the rule-making hearing would be their one and only opportunity to challenge the substantive merits of the rule. As far as the registrants knew, they would still be entitled to title 7 review after the rule-making hearing. Thus, it is unpersuasive to posit that these registrants had an opportunity to fully litigate this issue. Had they known at the time of the rule-making hearing that the Commissioner intended to take the unprecedented step of foregoing title 7's scientific review provisions in cancelling their registrations, the rule-making hearing would likely have proceeded differently.